## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) CHARLOTTE SIMMONS, as Special Administratrix of the Estate of RICO THOMAS, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>(1) CORECIVIC, INC., a foreign for-profit business corporation,<br>(2) JAMES YATES, in his individual capacity as Warden of Davis Correctional Facility,<br>(3) DEFENDANTS DOES 1-10,<br><br>    Defendants. | Case No.:  19-CV-234-SPS<br><br><br>Jury Trial Demanded<br><br>Attorney Lien Claimed |

### COMPLAINT

**COMES NOW**, Plaintiff Charlotte Simmons ("Plaintiff" or "Ms. Simmons"), as the Special Administratrix of the Estate of Rico Thomas ("Mr. Thomas"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff is a citizen of Oklahoma and the duly-appointed Special Administratrix of the Estate of Mr. Thomas.  Ms. Simmons is also Mr. Thomas' mother. The survival causes of action in this matter are based on violations of Mr. Thomas' rights under the Eighth and/or Fourteenth Amendments to the United States Constitution.

2. Defendant CoreCivic, Inc. ("CoreCivic" or "Defendant") is a foreign, for-profit business corporation doing business in Hughes County, Oklahoma.  CoreCivic is a private corrections company that contracts with the Oklahoma Department of Corrections ("DOC") and counties, including, during the pertinent timeframe, Hughes County, to operate private prisons. CoreCivic

was at all times relevant hereto responsible, in part, for providing care and supervision to Mr. Thomas while he was in the custody of the DOC at Davis Correctional Facility ("Davis" or "Prison") in the town of Holdenville, Hughes County, OK. CoreCivic was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the housing and supervision of inmates at the Prison, and for training and supervising its employees. CoreCivic was, at all times relevant hereto, endowed by Hughes County and the state of Oklahoma with powers or functions governmental in nature, such that CoreCivic became an agency or instrumentality of the State and subject to its constitutional limitations.

3. Defendant James Yates ("Warden Yates" or "Defendant Yates"), a CoreCivic employee, is the Warden of Davis Correctional Facility acting under color of state law. Upon information and belief, Warden Yates resides in Hughes County, Oklahoma. Warden Yates is sued in his individual capacity under the theory of supervisory liability.

4. Defendants DOES ##1-10 are detention and medical staff, unidentified as this time, and as described more fully below, who committed underlying violations of Mr. Thomas' Constitutional rights.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## **FACTUAL ALLEGATIONS**

### A. Mr. Thomas' Background

8. Paragraphs 1-7 are incorporated herein by reference.

9. Decedent Rico Thomas had a long, documented history of severe mental illness, including depression and schizophrenia.

10. Mr. Thomas' mental illnesses were so severe that the Tulsa County District Court ordered him to undergo regular outpatient mental health treatment at Family and Children's Services in Tulsa, OK.

11. Mr. Thomas generally responded well to his treatment, and did his best to diligently attend his court-ordered treatment sessions.

12. Unfortunately, Mr. Thomas' conditions and life circumstances sometimes hindered his progress.

13. He lived near Fifth Street and North Cheyenne, and relied on the city buses to transport him to his appointments. If Mr. Thomas failed to take his prescribed medications, which was the case occasionally, his condition rapidly deteriorated, making basic tasks seem insurmountable.

14. When Mr. Thomas failed to attend one of his treatment sessions, the court would order that he undergo a period of inpatient treatment at the Tulsa Center for Behavioral Health, so that the mental health professionals could ensure that he resumed taking his medications.

15. Mr. Thomas missed one of his outpatient appointments in September of 2010, and therefore was required to receive inpatient treatment at the Tulsa Center for Behavioral Health from September 13 to October 14, 2010.

16. While his mood was reported to be stable upon his discharge on October 14, 2010, he was readmitted to inpatient treatment on October 20, 2010.

17. On October 22, 2010, Mr. Thomas was again cleared to leave inpatient treatment, and his treatment providers noted that he "demonstrates stable mood and increased judgment and insight for outpatient treatment."

18. Tragically, however, Mr. Thomas suffered from an extreme episode of his schizophrenia just six days later. On October 28, 2010, while in the midst of full psychosis and suffering from severe delusions, Mr. Thomas shot both of his parents, killing his father, Richard Dennis Thomas, and seriously injuring his mother, Charlotte Simmons.

19. Mr. Thomas, who had no previous criminal record, was declared incompetent to stand trial in September 2011 by a psychologist who evaluated him.

20. He was then committed to the Oklahoma Forensic Center in Vinita, OK for treatment, and was declared competent to stand trial approximately four months later after he became fully compliant with his medications. His psychologist from the Oklahoma Forensic Center declared that Mr. Thomas, upon his discharge, was "no longer exhibiting any substantial signs associated with mental illness."

21. Mr. Thomas subsequently, and with tremendous remorse, pleaded guilty to shooting his mother and father. In accordance with the plea agreement, Tulsa County District Judge Kurt Glassco sentenced Mr. Thomas to two concurrent 38-year terms in DOC custody.

22. On or about January 17, 2013, Mr. Thomas was booked into Davis Correctional Facility ("Davis" or "Prison") in Holdenville, OK.

**B. History of Violence at CoreCivic Facilities**

23. Davis is a 1600-bed, medium/maximum security prison for men.

24. Davis is owned and operated by Defendant CoreCivic, which is the nation's second largest private corrections company.

25. CoreCivic was founded in 1983 and currently houses approximately 90,000 inmates in its

4

more than 60 facilities nationwide, which resulted in approximately $160 million in net profit in 2018.

26. Up until 2016, CoreCivic was known as Corrections Corporation of America ("CCA").[1] It has been widely reported that CoreCivic changed its name in an effort to combat mounting criticism for its woefully inadequate prisons that led to deplorable conditions for its inmates.

27. CoreCivic currently owns and operates two prisons in Oklahoma: Davis Correctional Facility and Cimarron Correctional Facility ("Cimarron"), which is in Cushing, OK.

28. CoreCivic also owns, and formerly operated, additional prisons in Oklahoma, including Diamondback Correctional Facility ("Diamondback") in Watonga, OK and North Fork Correctional Facility ("North Fork") in Sayre, OK.

29. Diamondback, which was constructed in 1998, closed in 2010 after losing a federal contract to house prisoners. Diamondback was plagued with myriad issues related to inadequate treatment and supervision of prisoners. A notable example being inmate riots that broke out in 2004.

30. North Fork, also constructed in 1998, closed in 2015 after experiencing similar problems, including rioting in 2000 (on two separate occasions) and 2011. Shortly after the 2011 riot, the state of California ended its contract with North Fork, which severely affected the profitability of the prison.

31. Cimarron, while still operational, has experienced its share of incidents as well. In 2013, Cimarron prematurely ended its agreement to house Puerto Rican inmates after a series of disruptive events at the prison. In June 2015, a fight between inmates sent eleven men to the hospital.

32. In September 2015, members of the Irish Mob engaged in a deadly brawl with members

---

[1] CCA and CoreCivic may be used interchangeably throughout.

5

of the Universal Aryan Brotherhood, which left four inmates dead and several others injured. There was only one prison guard assigned to the unit at the time, and he had only been employed by Cimarron/CCA for eight months at the time. The guard, Terrance Lockett, admittedly had no idea how to react when the fight started. He later radioed for help, but misidentified his location. Lockett escorted a terrified inmate back to his cell after nurses arrived, but instead of locking the inmate back in his cell, Lockett inexplicably pepper-sprayed the scared and compliant inmate. Prison guards eventually quelled the chaotic riot, but not before it would become the deadliest prison riot in Oklahoma history.

33.   In March 2016, a group of inmates threw another inmate off of the pod balcony. The chilling scene was captured on video by another inmate who possessed a contraband cell phone. It is unclear if the inmate who was thrown survived, or if any charges were filed. In May 2017, there was another serious altercation between prison guards and inmates that resulted in several inmate injuries and four guards being sent to the hospital.

34.   In recent years, three different prison guards at Cimarron allegedly engaged in various sexual acts with different inmates. Former guards Sara Lynn Stelzer and Lisa Marie Shannon ultimately pled guilty to unlawful access to a computer on the condition that the charges related to illegal sexual acts with inmates be dropped. Stelzer was initially charged with sexual battery after she allegedly watched and assisted an inmate engage in sexual acts. The inmate also disclosed that Stelzer caught the inmate with marijuana but let him keep it after he found out that she was in a sexual relationship with another inmate.

35.   Shannon engaged in sexual intercourse with an inmate in 2015 and was fired in 2016 after she admitted to the sexual acts.

36.   Terry Lynn Sneed, another prison guard, was charged with forcible oral sodomy in 2017 after allegedly performing oral sex on an inmate. Security footage from the prison also revealed

that Sneed and the inmate later entered the staff bathroom, where the two engaged in another sexual act.

37. Davis, which has been open since 1996, has not been immune from controversy. Between October 2014 and August 2015, three inmates were murdered by other inmates.

38. In October 2014, inmate Joshua Wheeler strangled his cellmate, 22-year-old inmate Tony Czernecki, to death in their cell. Wheeler had been convicted of first-degree rape in 2012 in connection with an incident in which he choked a 19-year-old woman for refusing his sexual advance, and subsequently forced her into having intercourse with him in a car. Prison guards saw Wheeler strangling Czernecki with an extension cord, but did not enter the cell until approximately 11 minutes later, allegedly because the cell door key didn't work. Czernecki was dead by the time the guards entered the cell.

39. Just two months later, in December 2014, Douglas Monroe Cecil strangled his cellmate, Eric Grimm, to death in their cell. At the time, Cecil was facing another first-degree murder charge for allegedly stabbing an inmate death in 2005 at the Oklahoma State Reformatory. Cecil, who ultimately pleaded guilty to murdering Grimm, allegedly had told guards at Davis not to put Grimm in Cecil's cell shortly before the murder.

40. In August 2014, inmate Lewis Hamilton was stabbed to death at Davis in an assault involving four other prisoners. Inmate Silas Royal was initially a lead suspect in the murder, but it is unclear if charges were ever filed.

41. On April 12, 2015, inmate Bryan Blackburn was bludgeoned to death in his cell. Blackburn's cellmate allegedly repeatedly beat Blackburn with a plastic food tray. The cellmate was also allegedly high on "bath salts" at the time of the murder. It is unclear if charges were ever filed.

42. On June 24, 2019, inmate Rosco E. Craig was found dead in his cell around 9:00 a.m.

Craig's cellmate is believed to be the culprit, but the investigation is ongoing.[2]

## C. CoreCivic's Culture of Indifference and Deceit

43. It's undeniable that prisons are often inherently dangerous places. However, CoreCivic has maintained a culture of indifference that allows violence to flourish within its facilities. CoreCivic has repeatedly inadequately staffed its facilities, inadequately trained the employees it does staff, failed to properly document serious incidents, and failed to make any efforts to rectify the sub-par conditions that lead to routine violent acts within its prisons. When authorities have attempted to investigate violence or other misconduct at CoreCivic facilities, CoreCivic has gone to great lengths to conceal their inadequacies, going so far as to purposely falsify documents and destroy crucial evidence.

44. In 2010, the FBI began investigating CoreCivic's (CCA at the time) policies and practices following an incident in which an inmate brutally beat another inmate unconscious at the Idaho Correctional Center. A video revealed that nearby guards stood by idly, watching the vicious beating. The American Civil Liberties Union ("ACLU") filed a lawsuit in the United States Court for the District of Idaho in March 2010 that alleged that guards were failing to protect inmates from violence by other inmates. The ACLU ultimately reached a settlement with CCA in September 2011 and was awarded $349,000 in attorneys' fees. Part of the settlement agreement ordered CCA to increase staffing levels at the Idaho facility

45. In 2012, however, the Idaho Department of Corrections ("IDOC") discovered that CCA had been falsifying staffing numbers and that it was failing to comply with the settlement agreement. The investigation found that CCA had overreported a total of approximately 4800

---

[2] Widespread violence is not unique to CoreCivic facilities in Oklahoma. In addition to the allegations described in paragraphs ##44-46, there have been notable prison riots in CoreCivic facilities in Mississippi, Vermont, and Kentucky in recent years.

staffing hours in 2012. In 2013, a federal judge held CCA in contempt of court for persisting to understaff the Idaho facility, in direct violation of their previous settlement. CCA appealed the judge's order, and the Ninth Circuit Court of Appeals affirmed the district court's order in all respects on May 23, 2016.

46. In 2016, journalist Shane Bauer obtained a job as a prison guard at Winn Correctional Center, a CCA-run facility in Winnfield, Louisiana. Bauer spent four months as a guard at Winn, and subsequently wrote a truly stunning exposé that described widespread violence between inmates, abysmal medical and mental healthcare for prisoners, and virtually non-existent training for staff.[3]

47. In 2015, the DOC sent four "notice to cure" letters to Cimarron informing the facility that it had breached various aspects of its contract with the DOC. Two of the letters informed CoreCivic that Cimarron had sent in late, inaccurate, or incomplete reports regarding critical incidents at the facility. In October 2015, the DOC sent a third letter regarding critical incidents that stated that it had still not received critical incident reports dating back to March 2015. The fourth letter admonished Cimarron for failing to follow its internal policies regarding surveillance camera footage. The specifics of CoreCivic's failure to comply with surveillance footage will be detailed more thoroughly, *infra*. Further, while the DOC has the power to punish CoreCivic by issuing monetary fines, it declined to do so in connection with the four letters it sent to Cimarron in 2015.

48. CoreCivic has made great efforts to conceal as much damning evidence about their practices as possible, as evidenced, for example, by their falsification of staffing hours in Idaho detailed, *supra*. CoreCivic additionally attempted to obscure its liability and policy violations related

---

[3] https://www.motherjones.com/politics/2016/06/cca-private-prisons-corrections-corporation-inmates-investigation-bauer/

to the September 2015 riot at Cimarron.

49. The DOC's Office of Inspector General's Office ("IG") began an investigation into the September 2015 riot shortly after it occurred. Then-director of the DOC, Robert Patton, additionally organized an After Action Review Team ("AART") to conduct its own investigation into the riot. Notably, however, is the fact that Cimarron/CCA employees comprised the majority of the eight-member AART.

50. Patton's stated goal was for the AART to investigate the incident and then make recommendations to the DOC regarding possible policy changes and/or disciplinary actions to be taken against Cimarron/CCA. It is unclear why Patton thought it was necessary for the AART to conduct its own investigation independent of the IG investigation.

51. Ultimately, the IG's office completed its Administrative Report, which concluded that Cimarron/CCA employees violated at least two of their own policies and also deleted at least three different pieces of surveillance footage that captured the riot. The IG's report also recommended that at least two inmates be charged with first-degree murder.

52. The AART report, on the other hand, did not discuss the deleted video footage and failed to note that Cimarron/CCA employees violated their "locked door" policy. The AART report was approximately six pages long and scant on detail. The AART report, however, was the only report released to the public in connection with the September 2015 riot. The DOC declined to release either its own IG report or the surveillance video of the incident. CoreCivic was not penalized or sanctioned by the DOC after the investigations were concluded, and no one was ever charged with murder, despite the IG's recommendation.[4]

---

[4] While the IG's report was not released to the public, it was obtained by The Frontier. The article discussing the IG report, AART report, and the surveillance video can be found at: https://www.readfrontier.org/stories/documents-and-video-detail-deadly-gang-fight-at-private-prison-facility/

### D. Mr. Thomas' Time at Davis Correctional Facility

53. Mr. Thomas was booked into Davis on January 17, 2013.

54. Upon information and belief, Mr. Thomas, for the most part, stayed out of trouble during his incarceration at Davis.

55. However, some time shortly before his death, Mr. Thomas allegedly found himself in a physical dispute with a prison guard, possibly due to the fact that Mr. Thomas was not regularly receiving his prescribed psychotropic medications.

56. Upon information and belief, Davis staff, fearing that Mr. Thomas could be a danger to himself and/or others at the time, placed Mr. Thomas in an isolated cell so that he could be monitored more closely.

57. Unfortunately, Mr. Thomas' isolation did not last long.

58. Upon information and belief, on or about July 2017, Davis staff placed another inmate in Mr. Thomas' cell with him due to overcrowding at the prison.

59. Mr. Thomas' new cellmate was a man named Brian M. Leshore.

60. Upon information and belief, shortly after Leshore was placed in Mr. Thomas' cell, he viciously beat and strangled Mr. Thomas to death, allegedly because he could not stand Mr. Thomas' body odor.

61. Upon information and belief, Mr. Thomas was murdered sometime in the very early morning hours of July 20, 2017, but was not discovered by prison guards until approximately 6:15 a.m. on July 20 due to Defendants DOES failing to complete their required cell checks.

62. On or about January 31, 2018, Leshore was charged with murder in the first degree in the District Court for Hughes County, State of Oklahoma.

63. Mr. Thomas' tragic death was the result of a systemic culture of indifference at Davis that permeates all of CoreCivic's detention facilities, including Davis.

64. For years, CoreCivic has utterly failed to properly train and supervise the staff at its detention facilities, including Davis. Importantly, Davis employees were not trained how to properly investigate and abate dangerous conditions.

65. Further, Prison employees have a culture of failing to conduct required sight checks, failing to report violent incidents between inmates, failing to take inmate complaints seriously, and failing to report policy violations to superiors.

66. CoreCivic additionally routinely understaffs its facilities, which leads to increased risks to inmates like Mr. Thomas. These risks are exacerbated by the fact that the Prison is often overcrowded.

67. CoreCivic is clearly on notice that their practice of understaffing and undertraining its employees, at Davis and other facilities, substantially increases the risks of inmate-on-inmate violence, as evidenced by the allegations in paragraphs ## 23-52.

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)
### (Defendants DOES ##1-10)

68. Paragraphs 1-67 are incorporated herein by reference.

**A. Underlying Violation of Constitutional Rights**

■ **Conditions of Confinement/Failure to Protect**

69. At the time of the complained events, Mr. Thomas, as an inmate already convicted of a crime, had a clearly established constitutional right under the Eighth Amendment to be free from cruel and unusual punishment.

70. The Eighth Amendment requires that convicted inmates like Mr. Thomas be offered reasonably adequate conditions of confinement. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the Eighth Amendment.

71. Any reasonable Prison employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

72. CoreCivic employees at Davis knew, or it was obvious, that Mr. Thomas, due to his severe mental health conditions, was at an increased risk of injury and thus needed to be monitored closely. But upon information and belief, the CoreCivic employee(s) assigned to check on Mr. Thomas while he was in a fragile mental state did not perform their required duties. By failing to regularly monitor Mr. Thomas after Leshore was placed in his cell, despite the fact that Mr. Thomas should have remained in an isolated cell, Defendants DOES ##1-10 deprived Mr. Thomas of his right to be free from cruel and unusual conditions of confinement.

73. Prison employees, including DOES ##1-10 were on notice, or it was obvious, that inmates like Mr. Thomas were at an excessive risk of being the target of violence at the hands of other inmates if they were not closely monitored, as inmate on inmate violence is an epidemic at Davis, evidenced by the fact that there had been at least four other inmate murders in the few years before Mr. Thomas' death.

74. Defendants DOES ##1-10's acts and/or omissions directly caused Mr. Thomas physical pain, severe emotional distress, mental anguish, terror, and ultimately his death.

### B. Municipal/"Monell" Liability (Against CoreCivic)[5]

---

[5] "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], **or** for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz,*

13

75. Paragraphs 1-74 are incorporated herein by reference.

76. CoreCivic is a "person" for purposes of 42 U.S.C. § 1983.[6]

77. At all times pertinent hereto, CoreCivic was acting under color of state law.

78. CoreCivic has been endowed by the Oklahoma Department of Corrections with powers or functions governmental in nature, such that CoreCivic became an instrumentality of the State and subject to its constitutional limitations.

79. CoreCivic is charged with implementing and developing the policies of the DOC and the Oklahoma Jail Standards with respect to the care and supervision of inmates in the custody of the DOC who are housed at Davis, and has the responsibility to adequately staff its facilities, and adequately train and supervise its employees.

80. In addition, CoreCivic implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Prison.

81. CoreCivic has maintained a custom of understaffing its detention facilities, including Davis. CoreCivic has additionally followed a practice of undertraining and/or inadequately training the staff that it does employ. Upon information and belief, these training and staffing shortfalls have resulted in: Prison guards that fail to routinely monitor inmates, including but not limited to especially vulnerable inmates that require an extra level of supervision, like Mr. Thomas; Prison guards that fail to respond to inmate-on-inmate violence; Prison staff that fail to document acts of

---

8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus she need not establish that CoreCivic had final policymaking authority for the DOC.

[6]   "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also, Smedley v. Corr. Corp. of Am.,* 175 F. App'x 943, 946 (10th Cir. 2005).

14

violence within the Prison and/or submit inaccurate or incomplete incident reports; Prison staff who do not report policy violations, whether it is an inmate or a Prison guard who commits the violation; Prison leadership who fail to investigate acts of violence or threats of violence; Prison leadership who fail to punish Prison staff who commit policy violations; Prison leadership who fail to report crucial investigations/reports to the DOC; and Prison staff who fail to adequately search inmates for contraband and/or makeshift weapons.

82. There is an affirmative causal link between the aforementioned acts and/or omissions of CoreCivic staff, as described above, in being deliberately indifferent to Mr. Thomas' right to adequate conditions of confinement, and the above-described customs, policies, and/or practices carried out by CoreCivic (*See also, e.g.,* ¶¶ 43-52; 62-67, *supra*).

83. CoreCivic knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Thomas. By fostering the aforementioned policies, practices, and/or customs, CoreCivic has created an environment in which vulnerable inmates like Mr. Thomas are exposed to an increased risk of violence. Nevertheless, CoreCivic failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Thomas', rights to be from inmate-on-inmate violence.

84. CoreCivic tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

85. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Mr. Thomas' injuries and damages as alleged herein.

### C. Supervisor Liability (Applicable to Warden James Yates, in his individual capacity)

86. Paragraphs 1-85 are incorporated herein by reference.

87. There is an affirmative link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Thomas' Eighth Amendment rights and policies, practices and/or customs that Warden Yates promulgated, created, implemented and/or possessed responsibility for.

   Such policies, practices, and/or customs, include, but are not limited to:
   a. Understaffing – especially in light of the fact that the Prison was often overcrowded;
   b. Nonexistent or inadequate training of Prison guards;
   c. A failure to document and properly report critical incidents, including incidents involving inmate-on-inmate violence;
   d. A nonexistent or inadequate internal investigation policy;
   e. A practice of withholding and/or destroying evidence relevant to critical incident investigations;
   f. A custom of failing to report employee policy violations;
   g. A custom of failing to discipline employees who commit policy violations;
   h. A custom of failing to adequately supervise inmates, including inmates with heightened vulnerability; and
   i. A custom of ignoring inmate complaints and/or threats of violence.
88. Warden Yates knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Mr. Thomas.
89. Warden Yates disregarded the known and/or obvious risks to the health and safety of inmates like Mr. Thomas.
90. Warden Yates, through his continued encouragement, ratification and approval of the aforementioned policies, practices and/or customs, in spite of their known and/or obvious

inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Thomas', serious medical needs.

91. There is an affirmative link between the unconstitutional acts of his subordinates and Warden Yates' adoption and/or maintenance of the aforementioned policies, practices and/or customs.

92. As a direct and proximate result of the aforementioned policies, practices and/or customs, Mr. Thomas suffered injuries and damages as alleged herein.

## PUNITIVE DAMAGES

93. Paragraphs 1-92 are incorporated by reference herein.

94. Plaintiff is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Mr. Thomas' federally protected rights.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages and punitive in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
---
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com

17

bobblakemore@ssrok.com
***Attorneys for Plaintiff***